24-2464 and 24-2761 and so Mr. Oestringer you are arguing as appellant in both cases and you've reserved two minutes for rebuttal you may proceed when you're ready. Good morning Glenn Oestringer for the Roth in both the Estee Lauder and the Altice case with me today as my partner Josh Borkman. The ELC which is which I abbreviation for Estee Lauder and Altice cases present a straight forward. Please speak right into the microphone. Okay these cases present a straightforward application of SEC rule 16A-1A2 which provides that a has an indirect pecuniary interest in transactions conducted by another person or entity and we'd cite for that this court's decision in Fetter v. Frost and an accompanying SEC amicus brief in that case. The term pecuniary interest as defined in the statute is the opportunity directly or indirectly to profit or share in any profit derived from a transaction in the subject securities that's 16A-1A2I and it's referred to by the SEC. Can you tell me what line you would draw because the way you describe it and the statutory language you avert to there's other languages cuts the other way but or at least used to but the way you describe it would mean that just about any time a company goes out for sales and buy stock that this would give rise to a kind of claim you have and that can't be what is meant is it? Now you're you're saying this is different but I'd like to know where you draw the line. Okay I agree with you your honor the in the Fetter case and the SEC accompanying brief the law was established that one has an indirect pecuniary interest if you're a controlling shareholder and you have the and you're able to influence. What do you mean by controlling shareholder? Controlling shareholder. Somebody who can tell the company what to do or somebody who has a significantly great financial interest so that they really benefit from it more than another. A controlling. These are two very different things. A controlling shareholder is an individual is a shareholder has the economic power through their shareholdings and their voting power to exercise control over the affairs of a corporation and so in the Fetter case Judge Winter put posited the same question that you now ask me. I often follow Ralph. And he and he he commented that it couldn't possibly net couldn't net has to be you know sufficiently brought brought in so that we don't overreach. But Fetter involved portfolio shares. Shares in another company. That's correct. And here we would be talking about treasury shares and treasury shares have different once they're purchased. They have different incidents of ownership. They don't pay dividends. They don't vote. Well that's correct. Why shouldn't we view them as different in kind and therefore not capable of being matched? All right. That's correct. And they have no value to the issuer right? Treasury shares. We don't think that the issue here is treasury shares. I think that the definition of pecuniary interest refers to a profit derived from a transaction. Not with what happens to the shares after the transaction. There's a purchase. There's a sale. And then profit is realized. And if if the shares are retired as treasury shares that that circumstance doesn't change the fact that there's been a transaction. That's that's the first point. With respect to casting the net and respect to the circumstance that Fetter was concerned with portfolio securities. The SEC in the amicus brief sets forth guidelines for determining how how the SEC should address transaction. How one determines whether there's an indirect pecuniary interest in other types of transactions other than portfolio securities. And you look to the principles which underlie the statutory purpose. You look to other to other portions of 16A-1A2 and you look to the case law. In this case we argue throughout all of our briefs and here today that the the standards set forth in Fetter v Frost and the SEC amicus brief which looks to whether you're a corporate insider and second secondarily under the safe harbor whether whether and if you there's no safe harbor if you're a controlling stockholder you know or if you're and in order to have a safe harbor in that case you have to have you have to be not be a controlling stockholder. But there's a considerable population of people who are deemed controlling stockholders. And so the question I have is what advice should a lawyer give to a person who's a director or an officer of a corporation about when and whether they can sell their shares considering that they may not have any control over whether the corporation acquires treasury shares within six months. Okay the answer to that is that the net doesn't reach anybody who is effectively not controlled the transaction and is trading through the company. That is the essence of this of who is within the scope of the rule. It turns on control. If if you're under the statute you're trying to guard against speculative use but based upon access to inside information so that if if a if a controlling shareholder who is controlling and has influence over share repurchase repurchases makes orchestrates through their power the repurchase at the same time they're going out in the. How do you deal with the fact that section 16 which would have prohibited this was removed as unnecessary. How do we deal with that. You're talking about 16A4C. Yeah. As unnecessary and the reason was unnecessary is because the issuer can't be liable to itself for you know for it for short swing trades. So it was redundancy and it was deleted. It had nothing whatsoever to do with what is set forth in 16A-1A2 which determines when you are a when you have an indirect pecuniary interest which is deemed to be. You're saying it's not the issuer in this case it's somebody who has a direct pecuniary interest. A direct or indirect pecuniary interest. And so I think the SEC explains the rule as follows. Defendant they say where control is present so the potential for abuse and section 16B was designed to prevent such abuse and such transaction should be attributed to the insider where he has control over the transacting corporation and otherwise the insider could trade on information and escape liability. And so we really don't want the purpose of the statute is to guard against speculative abuse by corporate insiders and as Judge Winters explained when you talk about when you talk about portfolio securities you cast the net more narrowly by imploring the safe harbor criteria. And the SEC has explained that if we're now dealing with issuer repurchases you have to look to the rule and its other provisions. And I would submit to the court that the same criteria that govern in portfolio securities governs here. If you're a controlling shareholder. But don't we really need some regulations which tell us more precisely when and when not. The way you have it would seem to give rise to suits. Maybe not all of them win but an enormous number of suits by people who say there was enough control, there was enough this. And well you know I hear what you're saying that there is a danger and a real danger. But if we were to decide for you in these cases where we're dealing with just a fairly vague statement we would be opening up something which would be I might be too dangerous. I mean I don't know. The danger of not doing it is there. I hear you but the danger of doing it. So isn't the answer to have some regulations which make it clearer when this is something to be avoided and not. Your Honor I would respectfully disagree. I think the SEC in promulgating the rule specifically contemplated that it would be a principles based rule. And applies to all indirect interests. And it applies to all indirect interests that constitute an indirect pecuniary interest. Interests where there is an opportunity for profit from a transaction and the issue is shares. And when you're talking about defining a purchase or any other transaction whether you look back to Blau v. Lamb or any of the large body of cases dating back decades in this court. The courts developed which transactions present opportunities for speculative abuse. The SEC in the amicus brief and Fetter was talking about portfolio securities which they characterized as in the corporate context. This case is in the present two cases are in the corporate context. You explained that the opportunity for profit lies when there's a controlling shareholder who is in a position to orchestrate the repurchase for the nefarious purpose. I agree with you it creates an opportunity for profit. But 16B is supposed to operate on a mechanical basis. I use the word mechanical that's what I said in an opinion. So it has to be mechanical. How is it mechanical? If when you look down the list of people who do various transactions you then have to figure out whether that person is in a position sufficient at that corporation to be able to control or to dictate the terms of a repurchase. Because after all if you have 90% sure but if you have 20% of DuPont you can certainly control that corporation. So it ceases to be mechanical. Well when you're looking at issues of speculative abuse on the current county there are fact issues. In Fetter v. Frost this court remanded for fact determinations as to whether Frost under a shareholder's agreement had sufficient control or influence over the transactions. Are you saying that the problem here is a 12B6 dismissal? Yes. And that you should at least get beyond that to summary judgment and have more information as to whether in this particular or these particular cases there is enough to meet whatever this standard might ultimately be? Well that's what this court held in Fetter v. Frost. They said the court determined that there were fact issues about whether Frost could actually control. In that case there were sales by Navi and Frost was a controlling shareholder of Navi. And so the question was whether those sales were matchable whether Frost had an indirect interest in. But what is enough to get us by 12B6? What allegations of control or dominance are enough to get that? Because if those are what is usually enough to get by 12B6 just you know I know after Iqbal and so on it's more than a mere statement but it has to be something plausible and that can very easily be done. And wouldn't that at least mean that almost every one of these cases would get by beyond 12B6? I don't respectfully I do not believe so. I think the bar is very high and the bar was set high in Fetter v. Frost. In this case if you look at Altice there are corporate filings which state that Mr. Drowhe who is the controlling shareholder. And with a you know absolute control of the company has you know through one of his controlled companies has the is vested with the authority to make the determination as to whether or not Altice will engage in any corporate any issue or repurchases. So in response to Judge Calabresi's question is it your view that you need or are entitled to discovery in order to figure out whether the person you claim to be a controlling shareholder is in fact a controlling shareholder who can determine whether the repurchase takes place? Absolutely. Because if that's the case how is anybody supposed to look at the filings under 16A and know if I match transactions? Because you then have to bring your claim, have litigation, have discovery. I don't see how you can mechanically match those transactions if you need discovery for it. Well in Blau v. Lamb the court said that once there's an indication, once there's a showing of you know the possibility of speculative abuse, well then you investigate it through discovery. And that's what this court did in Fetter v. So it's the possibility of abuse that you're talking about. Well there has to be a plausible pleading. The possibility of abuse. But actually in this mechanical system it doesn't matter whether there's abuse or not. There's no requirement of see enter, intent or anything else. It's just purely mechanical. You match these two transactions and you do a subtraction and you have a profit. Well the SEC in the Fetter brief said that once there's a showing that you have a controlling shareholder and there's a showing that that shareholder has the power or control to direct the repurchases. Or in that case direct the transactions in the portfolio securities. Then an inference arises that there is a claim. And then they can come forward and rebut that. That the situation you were describing has within it the seed of abuse and it may be, you may be right or it may be an existing loophole but that's probably for your adversaries too. All right counsel you have two minutes reserved for rebuttal. Thank you. Mr. Tripp. Your honors it may please the court. So we're asking the court today to affirm Judge Cronin's thoughtful. Speak right into the microphones. You're a little taller. You can raise the podium. Up on top there's a button. There you go. Can you hear me? Yeah. So we're asking the court to affirm Judge Cronin's thoughtful opinion for closing his theory. My friend started with the regulations. I'd like to start with the statute and then I'll talk about the regs and then maybe one point about the consequences of his opinion and the lack of a line. I think to sort of pick up on some of the questioning. I think the statute actually answers a lot of the questions here and it's very clear that his rule is out. And there's basically three independent and mutually reinforcing reasons in the statute why his argument fails. And if I could it's reproduced in the red brief at page four. And if I could just quote, just read some of it to you. It's very powerful. I think the first problem for him is that the statute is very clear that the insider and the issuer have to be different. You cannot treat the insider as the issuer. You see this first in the definition sort of at the beginning of the statute is explaining who is the insider. It's the beneficial owner, director, or officer. And they're defined by reason of his relationship to the issuer. So they have to be different. The next one is the- And just to, I appreciate you proceeding with it, but as an analytical framework, you're making an argument about the clarity of the text. And I understood your argument to be essentially it doesn't even need to be clear in our direction because we have required a clear statement rule for purposes of strict liability. Is that right? Yeah, I think that's right. I mean, I think we have the text, we have the statute, we have the regs, we have a lot behind us, I think, for the reasons Judge Cronin explained. Why doesn't a controlling shareholder have a relationship to the issuer? That would be the relationship. Well, I agree that they have a relationship, Your Honor. What I'm saying is you can't treat them as one and the same. And maybe that's sort of two, I think, more powerful pieces. I mean, the relationship doesn't mean that you can't be the same. So maybe can I sort of keep going through the statute because I think it helps. It would be a unique relationship. It helps to answer that. So maybe the sort of two pieces, the disgorgement remedy. My friend said the issuer can't be liable to itself. I think that's a very serious problem for him. And the next and probably my favorite is it says that the statute operates irrespective of any intention on the part of the beneficial owner, director, or officer in entering into such transaction. So who is it that needs to enter into such transaction? The answer is the beneficial owner, director, or officer. The issuer is not on the list. This does not cover issuer repurchases. And that's only the sort of first problem for him under the statute. The next one, and I think, Your Honor, Judge Jacobs, I think this picks up on some of your questions, is the thing that you need to have beneficial ownership of to trigger the statute. You need to have a purchase and a resale of an equity security. But I think, as your question pointed out, a treasury stock is really different in kind. Because when a company – I am perfectly willing to agree with you that we can read the statute in ways that protect you. I think there are things in the statute, as opponents say, that would allow us to read it the other way. So for me, the issue is, aren't there situations in which if we read the statute your way, precisely what insider trading is there to avoid would be permitted and permitted to the grossest extent. In other words, isn't this a problem which we can say the statute was designed, in general terms, to go against. And so my question is, is there a way of reading this so that it applies to those situations and doesn't give rise to at least getting by 12B6 in almost every situation in which a company which has some people who are more powerful than others does a transaction of a sort that companies do all the time. So that's my problem. I think, respectfully, Your Honor, I think the answer is no. There's no way to read the statute to pick up issuer repurchases. And I understand that there can be some concerns about issuer repurchases and maybe sort of a few points. The first, of course, is that the statute just doesn't cover it. This is a strict liability mechanical provision that is applying to an insider's purchases and resales. You need to have those sort of matching transactions. And, of course, we don't have that here. This is something the SEC and Congress are very aware of. The last figures we have are there are $950 billion in repurchases in 2021, so nearly a trillion dollars a year. So this is something the SEC and Congress are surely aware of. The SEC's longstanding and consistent position is it is out of the statute. I think Congress has considered this. And if they wanted to, I guess Congress could change their rule. It seems to me you have to concede that this is a loophole. This is a way in which you can make a bundle of insider information. I want to actually just push back on sort of one piece of this. I recognize that there have been some criticisms of issuer repurchases and whether it should be a subject of related rule. That's not our problem. But that's an issue for Congress. I think one point that I do want to just be sure comes across, and this was going to be sort of my third point in the statute, is there needs to be the opportunity to realize a profit because of the transaction in the securities at issue. And one thing I just want to be sure to drive home is that the capital flows in the issuer repurchase are really in the wrong direction. This is a situation where a company has capital, right, and the insider, sort of by hypothesis, is in control. In order to repurchase the stock, the money has to go out the door. Here's to unrelated third parties. There are very large amounts of money, hundreds of millions of dollars, going out to unrelated third parties. So the money goes away. It has the effect of basically shrinking the size of the corporate pie. And it's true that it makes each slice a little wider. All of that is true. But it doesn't take away from what Jacob said that if we read it your way, some people can make a bundle of the basis of inside information. And if you compare that with how strictly inside information has been used to go after people who have a little bit of knowledge here or a little bit of knowledge there, and we send them to jail for ten years for doing that, and then we allow this, which is huge. So, you know, there is a problem here of an inconsistency that seems almost so irrational that one shouldn't read the statute to allow it. Maybe two points, Your Honor. Of course, there's always 10B, right? So if you have situations where it's actually abusive, actually manipulative, there's actually trading on inside information, then you only need one trade and 10B picks it up. This is a mechanical statute that is about the situation where you have matching trades by the insider on both sides. And if I could, maybe just one last point. I think my friend tries to draw force from a law review article that is criticizing issuer repurchases, talking about some of the issues with him. And with them, of course, the law review article is dead against him on the statute, right? It says, Section 16B does not apply to indirect purchases through stock buybacks. And he was asked. As an academic, I don't look to law review articles too often either way. I haven't read a law review article. No, I know. But he said in congressional. He actually said one thing, I think, very nicely. In congressional testimony, he was asked if issuer buybacks should be banned because of some of these criticisms. And his answer was no. That would be, quote, drastic. It would be extremely disruptive to firms and extremely harmful to shareholders. And so I think this is an issue that is properly directed to Congress. This is a statute that does not apply to issuer repurchases. And so we're asking you to affirm Judge Cronin's thoughtful opinion. You were referring earlier to the possible availability of 10B as a way to mitigate any abuses that have been identified by your adversary. Would 10B operate here, where the profit, based on the insider transaction, is created in just this way? So there's no allegations in our complaint of anything like that, right? Because they've just alleged it is a- You're just saying, don't worry about the loophole. Posit that it's a loophole. You're saying, don't worry about the loophole because you have 10B. But I'm asking you whether, in your view, and maybe you don't have informed of you because there's no reason to, but hypothetically, whether 10B would operate to foreclose this kind of transaction. Yeah, I think you could imagine a situation, right, where an insider buys in advance, buys low, is aware that there's going to be a stock repurchase coming, and is aware that the markets are going to react positively to that and the price is going to go up. And then if he buys in advance of that, that's insider trading, right? He's trading on inside information. And if he buys low and then sells high within six months, then you're back to the mechanical operation of Section 16. But what you don't get is to mix and match and have the repurchase by the issuer and then the sale by the insider because that's just not what the statute applies to. It requires the transaction, two transactions, by the beneficial owner, director, or officer, and here there's only one alleged in all of the complaints. And I think one of the—my friend said that the bar is set high. We have multiple complaints. They're materially identical. I think it drives home that the bar is actually extremely low because issuer repurchases, they happen to the tune of approximately $1 trillion a year. Is there any valid legal distinction, in your view, between these two cases? The outcome, the analysis, any difference? Not that we see. Thank you. All right, thank you. We'll hear from Counsel Florin. Is this good? Good morning, Your Honors. I'm Joseph Florin, Morgan Lewis, for the defendants in Apolles in the Rothley-Drahe case, and may it please the Court. Just to cover one additional point on the statute itself and how it is read, is that the Supreme Court, as well as the circuit, of course, has given us plenty of instruction on how this statute should be read, and we've already covered the point that it should be mechanical, but why should it be mechanical? It's because it operates irrespective of the insider's intent, and it is unfair, unjust, for this sweeping law to be pushed beyond its clear boundaries, and that's what the Supreme Court said in Foremost McKesson, that it's inappropriate to reach the harsh result of imposing Section 16B's liability without fault on the basis of unclear language. Congress wishes to impose such liability. We must assume it will do so expressly or by unmistakable inference. We have the Magma Power and Perceptive Advisors cases from this court that follow through on that principle and apply it in context that, although not like this one because no one has ever seen this kind of case before under Section 16B, they do show the thread throughout all of the cases, and another important point there is that an insider's inactivity cannot give rise to Section 16B liability. Let me turn to the rule and the SEC's pronouncement, and I'd like to just make three points on that. The first point is why are we even talking about the SEC Rule 16A1? That was adopted in 1991 in the very same release, the very same regulatory action whereby the commission deleted the former Rule 16A4C. And what did the commission say when it was doing that? It said, and I quote, Transactions by the issuer are not subject to Section 16 since the issuer is the beneficiary of the short swing profit provision. Close quote. That's at page 7263. And that's not what my adversary read it to say. It said, Transactions by the issuer are not subject to Section 16. That categorical statement. They then said because, and in the situation here, they claim that instead because of a peculiar relationship of ownership, these people are making a bundle. Yes, Your Honor. How do we read this because as just saying we don't need it in the bulk of cases because it doesn't matter but doesn't say anything about the rest? Now, that's ambiguous, and you say it has to be manifestly clear. That's a different argument. Your Honor, that because statement that the SEC made, it's fully applicable in this and literally 100% of Section 16B cases. What it reads is that the issuer is the beneficiary of the short swing profit provision. That's true here. If plaintiff were to prevail in this case, the issuer would be the beneficiary. That's true in every Section 16 case. And because that's true under the statute itself, the SEC recognized that you cannot have transactions by the issuer subject to Section 16. It's the transactions. Those are the only transactions that are alleged to be purchases in this case, the transactions by the issuer. So in order to read the other rule that the commission adopted at the same time in the same rulemaking, 16A1, in order to read that, as the plaintiff would suggest, you have to cross out the word not from the SEC's statement. You have to assume that it meant the opposite of what it said. And I want to emphasize, the SEC statement there, that's this exact context. It's talking about issuer repurchases. The SEC didn't say anything about issuer repurchases in 16A1. My second point about the SEC rule is the liability regime exists alongside and hand-in-glove with the reporting regime. There are 180,000 Form 4s filed every year by insiders. Now, according to plaintiff, that number should be much higher because the plaintiff agrees. You look at their reply brief, they agree that the reporting obligation is coterminous exactly with what they claim is the extent of liability. So according to plaintiff, my clients and every other corporate insider should have been filling out these Form 4s two days after the issuer made a repurchase. So we both cited the court to the form and the instructions. Clearly, they don't say anything about it. I want to make me very simple-minded. If we read the statute as you say, and it certainly is plausible to read it as you say, does it not still create a situation in which some people who have significant ownership of a company, because of their insider knowledge, are able to make a bundle on the basis of insider trading, which in almost every other situation is forbidden? That's the question that Jacob's asked, and it is still there. And that is, if we read the statute as you say, doesn't that lead to one result, which on its face might seem to people as absurd? Not at all, Your Honor. That possibility that you described, which is not alleged in my case, but that possibility existed before the statute, it exists after the statute, it's simply not covered by this statute. It's covered by other statutes. It's covered by Section 10B, also by Section 9A, that if someone is acting with ill intent in connection with a purchase or sale of securities, and they can profit from it, then there is a severe remedy, and in fact they can be put in jail, as was referred to earlier. This statute doesn't operate that way, and it can't, because it would be unjust in virtually every case, especially if a new rule were announced retroactively, using the lawsuit process as kind of a judicial... As I said to the other side, the problem of the other way is, if we read it his way, pretty much every case would get by 12B6, and we'd have a problem that is not insignificant. That is a basic problem with the plaintiff's theory, is that... I'm not very comfortable with your saying, oh, don't worry about it, there are all sorts of other statutes and things that would allow people to go after, because I don't see that as anywhere near as easy as you do. Well, Your Honor, I would commend the court to the Gwazdzinski decision, and it sort of encapsulated this whole line of cases, including Blau v. Lamb, and the Kern County case that the plaintiffs are fond of citing here, and explained how we use this intent. We don't use it as an expanding liability mechanism. Instead, it's only used to limit liability. I would love to have both your counsel and counsel on the other side sit down and write me some good regulations, but that ain't the way it usually happens. And in fact, that's really what this case is about, we would suggest, is it's a misdirected case in the judicial branch, and should be directed to either the executive, the SEC, or really, because the way the statute is written, we think to Congress. And in fact, that did happen. Professor Freed, who's one of the three commentators that commented on this issue, all of whom agree with our position and say the plaintiff is wrong. But Professor Freed, in particular, has been hammering on this for decades to Congress, saying Section 16B doesn't cover this situation, so you need to do something about it. And he wasn't primarily concerned with this theoretical possibility that insiders themselves could abuse it by, like, trading in advance of what they know is a coming repurchase. He's more concerned with the fact that the corporation itself could benefit at the expense of the people it's buying shares from. That's the kind of ill that does not even begin to be within the coverage of Section 16B. Thank you. And if I could make just one last point to address one of the court's earlier questions. Where does this controlling person notion come from? It doesn't come from the statute. It doesn't come from the rule. And why did the feeder court talk about it? The feeder court talked about it because in that case, it was dealing with this safe harbor, the safe harbor for transactions by an insider in portfolio securities of another entity, not the issuer, but another entity in which it owns shares. And we know from the rule itself that portfolio securities can never include shares in the issuer itself. And that whole safe harbor, which is the only place in the SEC rule that talks about controlling person, that whole safe harbor can never apply to issuer repurchases. Take a look at Rule 16A1G that takes it right out of the definition. Thank you. Are these two cases identical from the defendant's point of view? I mean, is there anything Mr. Tripp said that you don't agree with? I agree fully with Mr. Tripp. I think legally they are identical. All right. Thank you. Thank you. Mr. Hofstranger, you have two minutes. Yes. Judge Calabresi, I would submit that the SEC has provided rules 16A-1A2, which address your concerns. In 16A-1A2II, the commission invites the courts in the corporate context and in other contexts to develop, to determine when a particular category of case should be within the scope of the rule. If you look at, and we have argued, and I think correctly so, that if you take the FEDER standard, it applies equally here. If you control the transactions, then there's an opportunity, and there's a showing of that the insider, that the controlling party controls the repurchases. Then there is an opportunity for speculative abuse. But on that inquiry, if the insider controls the repurchases, it does seem, well, I guess let me just get your response to the contention that the concern there, the use of inside information, could be pled as a 10B violation. It may not be fraudulent in any respect. The statute was originally intended to be mechanical, but then you have unorthodox transactions and you have current county inquiries into opportunities for speculative abuse. You're saying that there are other ways of dealing with this don't apply because if this is not forbidden, there's nothing wrong with it. That's correct. Most of us can make bundles in ways which are not wrong. They're not fraudulent. They're not 10B. They're not this. They're not the other. They've given me a chance to make a whole lot of money because I know something, so why shouldn't I do it? That was at the, you know, Section 16B was at the cornerstone of the Exchange Act, and it was designed to deal precisely with this problem, that there's no other remedy, unless you have a strict liability statute that addresses this. And in Fedder, this court said, found that the SEC had the authority to promulgate Rule 16A-1A2, and they did. And they set forth guidelines. And in Fedder, the court found that there were fact issues that had to be determined, you know, at the trial level. All we're suggesting and arguing for is that this case should have a full record. And we're also looking to Judge Winter's observations that you can't cast the net too widely. And Judge Winter looked to the criteria in the safe harbor. And we're saying that the same criteria apply to other indirect interests within the scope of, you know, 16A-1A2-II. Thank you very much. Thank you. Appreciate the arguments. The matter is taken under advisement.